**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) CASE NO. __2:10-cv02893-RMG_____ ) |
| v. | ) **FILED UNDER SEAL** ) |
| RONALD E. SATTERFIELD; GRAHAM STREET FOREX GROUP, LLC; SHORE-2-SUMMIT FINANCIAL, LLC; and NICHOLAS BOS, individually and d/b/a Boss Financial Service, | ) ) ) ) ) ) |
| Defendants; and | ) ) |
| PATRICIA L. BOS, | ) ) |
| Relief Defendant. | ) ) ) |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETERY PENALTIES, AND OTHER EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff, the United States Commodity Futures Trading Commission (the "Commission" or "CFTC"), by its attorneys, alleges as follows:

## I.     SUMMARY

1.     From at least March 2006 through March 2009, Defendants Ronald E. Satterfield ("Satterfield"), Graham Street Forex Group, LLC ("Graham Street"), Shore-2-Summit Financial, LLC ("Shore-2-Summit) and Nicholas Bos, individually and d/b/a Boss Financial Service ("Bos") (collectively "Defendants"), directly and through their officers, employees, and/or agents, fraudulently solicited over $3.3 million from more than 70 members of the general public

1

residing in at least four states for the purpose of participating in a pooled investment vehicle trading in agreements, contracts or transactions in foreign currency that are margined or leveraged ("forex").  From June 18, 2008 through March 2009 ("the Relevant Period"), Defendants received approximately $1.9 million in funds from forex customers.

2.      In soliciting actual and prospective customers to deposit funds, Defendants, directly and through others, made the following fraudulent misrepresentations or omitted the following material facts, among others: (1) the omission that Defendants misappropriated customer funds;  (2) the omission that customer funds were not all used to trade forex; (3) the misrepresentation that Satterfield was a successful forex trader; (4) the misrepresentation that Satterfield's forex trading generated sufficient returns to consistently pay customers 2% – 4% returns per month; and (5) the misrepresentation that there was no risk of loss of customers' principal.

3.      Upon information and belief, Defendants operated a "Ponzi" scheme by paying so-called returns to customers with those customers' own money or the money of other customers.  In doing so, Defendants misappropriated customer funds.  Upon information and belief, Defendants also misappropriated customer funds for personal use and transferred funds to Relief Defendant Patricia L. Bos ("Relief Defendant").

4.      To conceal and perpetuate their fraud, Defendants issued or caused to be issued false account statements to customers reflecting the promised returns based on Defendants' purported successful trading of foreign currency contracts.  Defendants' false account statements concealed their misappropriation, lack of trading and/or trading losses.

5.      By dint of this conduct and the further conduct described herein, from the enactment date of the CFTC Reauthorization Act of 2008, June 18, 2008, through the present,

Defendants engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(2)(A)-(C) of the Commodity Exchange Act ("CEA" or the "Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), § 13102, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C)).

6.     Defendants Satterfield and Bos, and other Graham Street and Shore-2-Summit officers, employees, and/or agents, committed the acts alleged herein within the course and scope of their employment, office or agency with Graham Street or Shore-2-Summit.  Defendants Graham Street and Shore-2-Summit are therefore liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation ("Regulation") 1.2, 17 C.F.R. § 1.2 (2010), as principals for their employees', agents', or officers' violations of the Act.

7.     Defendant Satterfield is a controlling person of Graham Street and Shore-2-Summit and did not act in good faith or knowingly induced, directly or indirectly, the alleged violative acts by these entities.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Satterfield is liable for Graham Street's and/or Shore-2-Summit's violations of the Act.

8.     The Relief Defendant is not charged with any violation of law.  Rather, Relief Defendant Patricia Bos obtained funds to which she is not entitled and which were derived from the Defendants' violations of the Act.

9.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2), the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act, as amended by the CRA, and to enjoin Defendants from engaging in

certain commodity or foreign currency related activities.  In addition, the Commission seeks civil

monetary penalties and remedial ancillary relief, including, but not limited to, restitution,

disgorgement, rescission, pre- and post-judgment interest, trading and registration bans, an

accounting, and such other relief as the Court may deem necessary or appropriate.

10.     Unless restrained and enjoined by this Court, Defendants are likely to continue to

engage in the acts and practices alleged in this Complaint and similar acts and practices, as more

fully described below.

## II.     <u>JURISDICTION AND VENUE</u>

11.     This Court has jurisdiction over this action pursuant to Section 6c of the Act,

7 U.S.C. § 13a-1 (2006), and Sections 2(c)(2)(C)(i)-(iii) of the Act, as amended by the CRA, to

be codified at 7 U.S.C. §§ (c)(2)(C)(i)-(iii).  Section 6c(a) of the Act authorizes the Commission

to seek injunctive relief against any person whenever it shall appear to the Commission that such

person has engaged, is engaging, or is about to engage in any act or practice constituting a

violation of the Act or any rule, regulation, or order thereunder.

12.     The Commission has jurisdiction over the matters alleged herein beginning June

18, 2008 pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the

Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2).

13.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2006), because Defendants are found in, inhabit, and/or transacted business in this

District, and certain of the transactions, acts, courses of business and practices in violation of the

Act alleged have occurred, are occurring, and/or are about to occur within this District.

### III.    THE PARTIES

A.    **Plaintiff**

14.    The **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with responsibility for administering and enforcing provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2006), as amended by the CRA, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2010).  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

B.    **Defendants**

15.    **Graham Street Forex Group, LLC** is a limited liability company formed in South Carolina on or about August 31, 2006 with its principal place of business at 91 Anson Street, Charleston, South Carolina.  Graham Street has never been registered with the Commission in any capacity and is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, and is not an associated person of such entities.

16.    **Shore-2-Summit Financial, LLC** was a limited liability company formed in South Carolina on or about June 28, 2005 with its principal place of business listed at 317 23rd Avenue North, North Myrtle Beach, South Carolina.  Shore-2-Summit was dissolved on or about December 31, 2009.  Shore-2-Summit has never been registered with the Commission in any capacity and is not a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company, and is not an associated person of such entities.

17.    **Ronald E. Satterfield** is an individual residing in Charleston, South Carolina and

is the Rector and Pastor of a church in Charleston, South Carolina. Satterfield is President, Secretary and Registered Agent of Graham Street Forex Group, LLC and is the signatory on bank accounts held by Graham Street. Satterfield has also identified himself as Secretary and Treasurer of Shore-2-Summit Financial, LLC, and is a signatory on bank accounts held by Shore-2-Summit. Satterfield has never been registered with the Commission in any capacity. He is not an associated person of a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company.

18.    **Nicholas Bos** is an individual residing in Ludington, Michigan who holds himself out as the owner and operator of Boss Financial Service, a financial advisory and planning business with its principal place of business in Zeeland, Michigan. Bos is an agent, representative or employee of Graham Street and Shore-2-Summit and has solicited customers on behalf of Graham Street and Shore-2-Summit to invest money for foreign currency trading. Bos has never been registered with the Commission in any capacity. He is not an associated person of a financial institution, registered broker dealer, insurance company, financial holding company, or investment bank holding company.

**C.    Relief Defendant**

19.    **Patricia L. Bos** is the wife of Nicholas Bos and resides in Ludington, Michigan. In August 2008, Nicholas Bos knowingly received $295,000 in customer funds from a Graham Street bank account and used these funds to purchase a personal residence in Ludington, Michigan, titled in the names of Nicholas and Patricia Bos.

**IV.    FACTS**

**A.    Defendants' Solicitation of Customers and Establishment of Accounts**

20.    Since at least March 2006, Graham Street and Shore-2-Summit, through their

6

officers, employees, and/or agents, including Satterfield and Bos, solicited and accepted funds from retail investors for the purpose of trading leveraged or margined forex transactions. Defendants solicited customers in person, over the telephone, and through word of mouth and promotional materials.

21.    Bos, acting as an agent and representative of Graham Street and Shore-2-Summit, solicited clients of his financial advisory and planning business, Boss Financial Service, as well as family, friends, personal and business acquaintances, and others in and around Zeeland, Michigan, to deposit funds with Graham Street and Shore-2-Summit for the purpose of trading forex. Bos distributed a business card throughout the community that appeared to be a one million dollar bill, with the advertisement "Special programs earn 24% a year."

22.    Satterfield solicited customers from North Carolina and South Carolina to invest funds with Graham Street.

23.    Satterfield also independently solicited acquaintances, members of his church congregation and their friends and family, and others in North Carolina, South Carolina, and Maryland, for funds to trade forex. These customers (Satterfield's "individual customers") did not invest with Graham Street or Shore-2-Summit. Satterfield instructed his individual customers to make their investment checks payable to him personally and then deposited customer funds into his personal bank account, where customer funds were commingled with Satterfield's personal funds.

24.    To open an account with Graham Street or Shore-2-Summit, prospective customers were directed to (a) give a check to Bos, who forwarded it to Satterfield, (b) give a check to Satterfield, or (c) deposit funds directly into specified bank accounts. Satterfield deposited and pooled Graham Street customer funds in Graham Street bank accounts and

deposited and pooled Shore-2-Summit customer funds in Shore-2-Summit bank accounts.

25.     Prospective Graham Street or Shore-2-Summit customers were also directed to execute a purported "loan agreement" or "promissory note." Defendants' promotional materials represented that "[t]his format is the only way to 'guarantee' a monthly return." These so-called "notes" or "agreements" were signed by Satterfield or Bos as representatives of Graham Street and Shore-2-Summit.

26.     From March 2006 through March 2009, Graham Street, Shore-2-Summit and Satterfield collectively received at least $3.3 million from over 70 customers for the purpose of trading forex. During this same period, Graham Street, Shore-2-Summit and Satterfield deposited only about $1.9 million into known forex trading accounts which were held in the names of Satterfield, Graham Street and Shore-2-Summit. However, upon information and belief, Graham Street maintained no trading accounts in its name during the Relevant Period.

27.     During the Relevant Period, Graham Street, Shore-2-Summit and Satterfield collectively received at least  $1.9 million from customers. Only about $737,000 was deposited into a forex trading account at an FCM. Virtually all of the customer funds deposited into forex trading accounts during this time period were lost as a result of Satterfield's unsuccessful forex trading. Satterfield, who had trading authority over the accounts, executed margined or leveraged forex transactions in these accounts. Satterfield's trading in these accounts typically resulted in a loss each month.

28.     In July 2007, Satterfield and/or other officers of Shore-2-Summit opened a trading account at registered FCM Interbank FX and deposited $43,000 into the account. Ultimately, $42,916 was lost through trading in this account, which has been inactive since April 23, 2009, with a balance of $83.77. No trading activity was conducted in this account from November

2007 through October 2008 or in December 2008.

29.    Satterfield opened seven (7) trading accounts in his own name at several registered FCMs between December 2003 and February 2009.  Four of these FCM accounts were open during the Relevant Period:

    a.    Satterfield opened ODL Securities account *G229 on November 8, 2007.  The last trade in this account was transacted by Satterfield in December 2008, and he formally closed this account on January 26, 2009, after transferring $46.73 remaining in the account to FXCM account *6623.  During this period, approximately $927,900 was deposited into this trading account and $927,853.27 was lost as a result of Satterfield's trading.  No funds were withdrawn from this account prior to the date of its closing.

    b.    Satterfield opened FXCM account *2846 on December 6, 2007.  The last trade in this account was transacted by Satterfield on April 7, 2008.  During this period, approximately $69,000 was deposited into this account and $68,013.93 was lost through trading.  Satterfield formally closed this account on August 18, 2008 and transferred the remaining balance of $986.07 to FXCM account *9632.

    c.    Satterfield opened FXCM account *9632 on August 19, 2008.  The last trade in this account was transacted on January 9, 2009.  During this period, approximately $292,186.07 was deposited into this account and $290,969.07 was lost through trading.  Satterfield closed this account on January 11, 2009 and transferred the remaining account balance of $1,217.00 to FXCM account *6623.

d. Satterfield opened FXCM account *6623 on January 11, 2009. The last trade in this account was on April 28, 2009. During this period, approximately $25,013.73 was deposited into this account and $24,914.24 was lost through trading. Satterfield closed this account on April 28, 2009. The approximately $99.49 remaining in the account at the time it was closed was transferred to FXCM account *7287, which was opened on September 13, 2009, after the Relevant Period.

30. Overall, Satterfield failed to generate any profits through his forex trading. From March 2006 through March 2009 Satterfield incurred net trading losses in all known FCM accounts for Graham Street, Shore-2-Summit, and Satterfield totaling at least $1.9 million.

31. Because there were no trading profits, the returns paid out to customers or reported in their statements, as well as commissions and other sums paid out by Defendants, came from existing customers' original investments or funds invested by new customers and were not, as Defendants had represented, based on any actual profits from Satterfield's forex trading.

32. Neither Defendants nor the FCMs that were the counterparties to the foreign currency transactions were financial institutions, registered brokers or dealers, insurance companies, financial holding companies, or investment bank holding companies or associated persons of such entities.

33. Some or all of Defendants' customers were not "eligible contract participants" as that term is defined in the Act. *See* Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1a(12)(A)(xi) (2006) (an "eligible contract participant," as relevant here, is an individual with total assets in excess of (i) $10 million, or (ii) $5 million and who enters the transaction "to manage the risk

associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual").

34.     The forex transactions conducted by Defendants at the FCMs on behalf of their customers were entered into on a leveraged or margined basis.  Defendants were required to provide only a percentage of the value of the foreign currency contracts that they purchased.

35.     The forex transactions conducted by Defendants at FCMs neither resulted in delivery of actual currency within two days nor created an enforceable obligation to deliver between a seller and a buyer that had the ability to deliver and accept delivery, respectively, in connection with their lines of business.  Rather, these forex contracts remained open from day to day and ultimately were offset without anyone making or taking delivery of actual currency (or facing an obligation to do so).

**B.     Defendants' Misappropriation of Customer Funds**

36.     Satterfield is the sole signatory on all known Graham Street bank accounts, and is a signatory on all known Shore-2-Summit bank accounts.  As a signatory, Satterfield controls the bank accounts through which Graham Street and Shore-2-Summit customer funds are received, paid out to certain customers, or misappropriated.

37.      Satterfield transferred a portion of the customer funds from Graham Street and Shore-2-Summit bank accounts into his personal bank accounts, where the customer funds were commingled with Satterfield's personal funds as well as with funds received by Satterfield from his individual customers, who made checks payable to Satterfield personally.

38.     Satterfield also transferred Graham Street customer funds to Shore-2-Summit bank accounts and vice versa.

39.     Although some customer funds were deposited into FCM accounts and traded

unsuccessfully by Satterfield, Defendants misappropriated the majority of customer funds to pay purported returns in furtherance of their Ponzi scheme, to pay purported commissions or fees to Graham Street and Shore-2-Summit agents, to make payments benefitting other officers, agents, and employees of Defendants, and for other personal uses.

40.     For example, during the Relevant Period, Satterfield received monthly payments of approximately $2500 from Shore-2-Summit's bank account.  Satterfield also used customer funds to make monthly payments totaling over $28,000 to his church during the Relevant Period. In December 2008, Satterfield used at least $24,000 of Graham Street customer funds to make payments to a log cabin building company.

41.     Between March 2006 and March 2009, Bos received at least $550,000 in purported commissions or fees from Graham Street and Shore-2-Summit bank accounts.  At least $220,000 of this amount was paid to Bos after June 18, 2008.

42.     In addition, on or about August 26, 2008, Satterfield and Graham Street used customer funds from Graham Street's bank account to issue a Cashier's Check in the amount of $295,000, which Bos used to purchase a personal residence in Ludington, Michigan titled in the name of Nicholas Bos and Patricia L. Bos.  Bos knew that this amount was taken out of customers' funds and has admitted to this fact.

43.     Upon information and belief, neither Bos nor Patricia L. Bos invested any personal funds with Satterfield, Graham Street or Shore-2-Summit.  Upon information and belief, Patricia L. Bos provided no legitimate services to Satterfield, Graham Street or Shore-2-Summit.

C.      **Defendants' Fraudulent Solicitations**

44.     In the course of their solicitations to potential and existing customers, and

throughout the period of time that such individuals remained Defendants' customers, Satterfield

and Bos omitted material facts and made material misrepresentations.  Defendants used the U.S.

mail, electronic mail, and other means of interstate commerce to transmit false representations to

customers.

45.    Based on the Defendants' omissions and misrepresentations, prospective

customers opened accounts with Graham Street and Shore-2-Summit, or directly with Satterfield,

and current customers deposited additional investment funds.

46.    With regard to Satterfield's material omissions, from June 18, 2008 through

March 2009, Satterfield failed to disclose to actual and prospective customers the following

facts:

        a.    that before and during the Relevant Period, Satterfield consistently lost

        money trading forex;

        b.    that, contrary to assertions that the Defendants took customer funds and

        traded forex contracts on their behalf, Satterfield used customer funds to make

        payments to other customers;

        c.    that a significant portion of customer funds were misappropriated to pay

        Defendants or their agents and for Satterfield's and Bos's personal use;

        d.    that Graham Street maintained no forex trading accounts at registered

        FCMs during the Relevant Period; and

        e.    that no forex trading was conducted in any known Shore-2-Summit

        account from November 2007 through October 2008 and in December 2008.

47.    Satterfield was required to disclose such material information because, in

promotional material, in the purported "promissory notes" he used, in false monthly statements

he created or knew about, and in personal conversations with customers, he knowingly and

falsely, or with reckless disregard for the truth, created and conveyed to actual and prospective

customers the impression that he traded customer funds successfully, when he had not.

Satterfield further falsely claimed that such trading generated profits of 2% to 4% per month for

Graham Street and Shore-2-Summit customers, which was untrue.  Satterfield was required to

disclose the truth about the misappropriation and the actual use of customer deposits at the time

he personally solicited actual and prospective customers, and every day that customers

maintained an open account with Graham Street, Shore-2-Summit or Satterfield.

48.    With regard to Satterfield's misrepresentations, from at least June 18, 2008

through March 2009, Satterfield, directly or through his agents, knowingly and falsely, or with

reckless disregard for the truth, represented to actual and prospective customers that:

a.    Satterfield was an experienced and successful trader who had been
engaged in profitable forex trading for several years;

b.    Satterfield's trading methods had yielded substantial profits;

c.    Satterfield's trading would generate annual returns between twenty-four
percent (24%) and forty-eight percent (48%) on the principal amount of their
investment, to be paid to Graham Street and Shore-2-Summit customers monthly
at the rate of two percent (2%) to four percent (4%);

d.    Satterfield was a "conservative" trader, employed a "conservative"
trading strategy, and would stop trading customers' money if trading losses
reached a certain point;

e.    there would be no risk to the customers' principal; and

f.    Graham Street and Shore-2-Summit would return the principal to

customers after one year.

49.     Satterfield knew that the aforementioned representations were false, or was reckless with regard to their truth, because he personally traded the forex accounts and knew that he generally lost money trading such accounts, he controlled the bank accounts, and misappropriated customer funds.

50.     With regard to Bos's material omissions, from August 2008 through March 2009, Bos failed to disclose to actual and prospective customers that at least $295,000 was taken from customer investment funds and provided to Bos for personal use.  Bos also prepared and distributed written statements to customers which failed to disclose or take into account the funds Bos received.

51.     Bos was required to disclose such material information because, in promotional material, in the purported "promissory notes" he used, in false monthly statements he created or knew about, and in personal conversations with customers, he knowingly and falsely, or with reckless disregard for the truth, created and conveyed to actual and prospective customers the impression that customer funds were being used by Satterfield to trade forex and that Satterfield's trading profits would be used to pay customer returns and refund their original investments.  Bos was required to disclose the truth about the misappropriation and the actual use of customer deposits at the time he personally solicited actual and prospective customers, and every day that customers maintained an open account with Graham Street, Shore-2-Summit or Satterfield.

52.     With regard to Bos's misrepresentations, from at least June 2008 through March 2009, Bos knowingly and falsely, or with reckless disregard for the truth, represented to actual and prospective customers that there would be no risk to the customers' principal investment.

53.     For example, Bos represented to customers who invested funds with Graham Street and Shore-2-Summit before and during the Relevant Period that investing funds with Satterfield was low risk, was as safe as putting funds into a certificate of deposit at a bank, and there would be no risk to the customers' principal investment.  Bos knew these representations were false, or was reckless with regard to their truth, because, upon information and belief, Bos had taken classes and received training on forex trading and was aware of the risk of loss associated with forex trading.

D.     **Defendants' False Statements, Omissions, and Concealment of the Ponzi Scheme**

54.     To conceal and perpetuate their fraud, Satterfield and Bos prepared and provided Graham Street and Shore-2-Summit customers with false account statements misrepresenting that the customers were earning profitable returns and that their investments were increasing by 2% to 4% of the principal investment amount per month.  In fact, Defendants never achieved these returns.  Moreover, none of these statements ever reported a loss despite the fact that the forex trading accounts consistently lost money and the fact that customer funds were being misappropriated to pay returns to other customers, purported commissions and fees, and Satterfield's and Bos' personal expenses.

55.     Satterfield also regularly prepared and distributed statements to his individual customers misrepresenting the earnings in their accounts from his forex trading.  For example, on April 15, 2009, Satterfield emailed a statement to one of his individual customers that reflected a total trading profit of $14,748.75, bringing her total stated balance to $109,748.75, when Satterfield had never achieved these returns.

56.     Throughout the Relevant Period, Defendants also paid some customers monthly "returns" at the promised rates and claimed that these returns were produced by Satterfield's

successful forex trading.  In fact, Satterfield's trading resulted in substantial losses and any purported profits or returns paid to customers by Defendants came from other customers' investment funds, which Satterfield and Bos never disclosed.

57.    Throughout the Relevant Period, Satterfield, directly and through his agent Bos, also knowingly and falsely, or with reckless disregard for the truth, assured prospective and existing customers, both verbally and in writing, that Satterfield was trading successfully and generating profits through his forex trading when, in fact, Satterfield was consistently losing money on trades.

58.    For example, on or about October 10, 2008, Satterfield sent Bos an email stating "I thought you and your friends might be encouraged in knowing that we have sailed through these financial storms with nice profit during the last few weeks" and "our gains are solid and consistent."  Bos forwarded or distributed a copy of this e-mail to Graham Street and Shore-2-Summit customers in Michigan, adding a handwritten note to some copies that stated "Our comfort zone."

59.    Additionally, on or about December 22, 2008, Satterfield emailed a statement to at least one customer that included the following false representation:  "We had a fine week. December tends to be the best trading month in Forex.  It sailed us upward and onward this past week."

60.    As another example, in late 2008, while soliciting one customer for additional funds, Satterfield claimed that investing with Graham Street at that time presented a good opportunity to make money and showed the customer a handwritten document that he falsely represented listed the large profits being generated by his forex trading at the time.

61.    In fact, Satterfield's total trading losses in October 2008 were approximately

$56,209.37, in November 2008 were approximately $47,714.87, and in December 2008 were approximately $38,416.31.

62.      In February 2009, Satterfield contacted another current Graham Street customer and misled the customer into investing additional funds by falsely claiming that he just had his best forex trading day ever and had made a profit of at least 7%.  Satterfield, however, incurred approximately $27,770 in total trading losses in January 2009 and approximately $10,000 in total trading losses in February 2009.

63.      By February 2009, funds in the Graham Street and Shore-2-Summit bank accounts had been virtually depleted and Graham Street and Shore-2-Summit began to fall behind in distributing "returns" to customers.  Checks were sent out late to customers and, in some cases, were returned for insufficient funds.

64.      Despite the grim state of their trading and bank accounts, Satterfield, directly and through his agent Bos, continued to solicit and accept funds from new and existing customers.  In March 2009, over $40,228 in customer funds was collected by Graham Street.  Of this amount, more than $30,000 was obtained as a result of Bos's solicitations of Michigan customers and $10,000 was obtained as a result of Satterfield's solicitation of a North Carolina customer.

65.      When customers made inquiries and demands for their funds, Satterfield and Bos responded with various excuses and falsely claimed that trading, banking, or accounting rules or regulations were preventing or hindering the transfer or release of customer funds.

66.      For example, on or about March 12, 2009, Satterfield distributed a letter to customers claiming that the monthly mailing date for interest checks was being changed from the 15th to the 22nd of each month to enable him "to move funds from a trading account into the operational account, where monthly checks are written" and "keep the flow of business flowing

in a consistent pattern." The letter further advised customers that "[c]hecks will be mailed, beginning March 22, 2009, and continue in that pattern." Only a few customers received any payments for returns after March 12, although Satterfield transferred $26,000 to Bos on or about March 3, 2009 and transferred at least $7,200 to himself from a Shore-2 Summit bank account between March 20 and May 29, 2009.

67.     Defendants used the U.S. mail, electronic mail, and other means of interstate commerce to transmit the false monthly statements and make misrepresentations to customers.

68.     The representations Defendants made to customers verbally and in written statements were false because, among other things, they failed to disclose: (1) Defendants' misappropriation of customer funds for personal use and to pay purported commissions or fees to agents; (2) that customer funds, not trading profits, are being used to pay returns to customers; (3) that not all funds were traded; and (4) the substantial trading losses sustained by Satterfield, Graham Street and/or Shore-2-Summit.

69.     As the person in control of the bank and trading accounts and conducting the forex trading, Satterfield knew that he was consistently losing money trading forex, that he was using existing or new customers' principal to pay returns to other customers and to pay commissions and fees to agents, and that he was misappropriating and commingling customer funds.

70.     Bos knew, or recklessly disregarded the fact, that customer funds were being misappropriated because he received commission checks issued from the same account as checks he distributed to Michigan customers as "returns" and was aware that the funds he used to buy the residence in Ludington, Michigan, in August 2008 were taken from customer investment funds. Moreover, Bos at minimum recklessly disregarded the truth of his representations to

customer regarding Satterfield's trading success because he had no proof of these statements.

**E.    Graham Street and Shore-2-Summit Ceased Operations and Satterfield Admits to the Scheme**

71.    On or about March 23, 2009, Bos sent letters to Graham Street and Shore-2-Summit customers in Michigan abruptly informing them that "all trading has ceased."  Later, on or about April 1, 2009, Bos sent a letter to Michigan customers stating that on March 23, 2009 he "received a phone call from the primary owner and manager of Shore-2-Summit LLC/Graham Street Forex Group LLC advising that the companies were no longer operating because all capital had been exhausted" and "[a]ll the money was gone."  Bos further represented that he had driven to South Carolina to meet with "the owner and his attorney" and that financial information, records and an accounting would be provided and shared with customers.

72.    On or about April 10, 2009, Bos distributed a third letter to Michigan customers claiming that Satterfield's attorney had verbally advised Bos that: (1) the amount of money customers invested with Graham Street totaled $1,997,000; (2) of this amount, $315,000 was paid out to customers as interest earned; (3) in late August 2008, a check in the amount of $295,000 was written for the benefit of Bos as a "60 day Temporary Loan"; and (4) Graham Street sustained $1,388,000 in trading losses.

73.    On or about May 2, 2009, Satterfield mailed a letter to Michigan Graham Street and Shore-2-Summit customers in which he admitted that customer funds were used to make monthly payments to other customers and to make payments to Bos and that some customer funds were also lost through forex trading.

74.    On or about May 5, 2009, Satterfield distributed a letter prepared by his attorney, based on unverified information provided by Satterfield, to numerous customers.  This letter, which purported to summarize and account for the distribution of customer funds, acknowledged

that the vast majority of customer funds were used to make payments to other customers or paid out to Graham Street or Shore-2-Summit officers, agents or employees, and claimed that the remaining funds were "lost in trading."

75.    In June 2009, an individual Satterfield customer residing in Maryland filed a civil action against Satterfield in the Circuit Court for Montgomery County, Maryland (the "private civil action"). After being solicited by Satterfield for funds to trade forex and hearing from him about his supposed success, in December 2008 this customer gave Satterfield a cashier's check for $91,000, made payable to him personally, which Satterfield deposited in his personal bank account. Although this customer had received written statements from Satterfield showing profits and gains on her investment, she was unable to withdraw funds and never received any of her original investment funds or the promised returns.

76.    In August 2009, Satterfield signed and agreed to the entry of a Final Consent Order in the private civil action. In the Final Consent Order, Satterfield admitted the court's findings, including:

    a.    Through emails and representations, Satterfield led a customer to believe that he would use the customer's funds to trade forex and that the customer would receive returns based on those trades;

    b.    Some, but not all, of the funds in each of the Graham Street and Shore-2-Summit bank accounts were transferred to Satterfield's personal bank account and then to many different forex trading accounts;

    c.    None of the funds that Satterfield deposited into the forex trading accounts were ever withdrawn or used to pay investors;

    d.    The customer was never told that Satterfield and Bos were using a large

portion of customer funds to pay themselves and other prior investors, instead

of using the funds for forex trading; and

e.   The account balances contained in statements Satterfield distributed to his

individual customers did not accurately reflect actual trading profits and

losses.

77.   By dint of their actions, from June 18, 2008 through the present, Defendants have

engaged, are engaging, or are about to engage in acts and practices that violate Sections

4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-

(C).

### V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT

**Violations of Sections 4b(a)(2)(A)-(C) of the Act, as Amended by the CRA**
**(Fraud in Connection with Forex Transactions)**

78.   Paragraphs 1 through 77 are realleged and incorporated herein by reference.

79.   Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at

7 U.S.C. §§ 6b(a)(2)(A)-(C), make it unlawful

> for any person, in or in connection with any order to make, or the making
> of, any contract of sale of any commodity for future delivery . . . that is
> made, or to be made, for or on behalf of, or with, any other person, other
> than on or subject to the rules of a designated contract market – (A) to
> cheat or defraud or attempt to cheat or defraud the other person; (B)
> willfully to make or cause to be made to the other person any false report
> or statement or willfully to enter or cause to be entered for the other
> person any false record; [or] (C) willfully to deceive or attempt to deceive
> the other person by any means whatsoever in regard to any order or
> contract or the disposition or execution of any order or contract, or in
> regard to any act of agency performed, with respect to any order or
> contract for or, in the case of [this] paragraph (2), with the other person. . .

80.   Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, apply to the foreign

exchange currency transactions, agreements or contracts offered by Defendants.

Section 2(c)(2)(C)(iv) of the Act, as amended by the CRA, to be codified at 7 U.S.C.

§ 2(c)(2)(C)(iv).

81.     As set forth above, from at least June 18, 2008 through March 2009, in or in

connection with forex transactions, made or to be made, for or on behalf of other persons,

Defendants Satterfield and Bos knowingly, willfully or with reckless disregard for the truth,

violated Sections 4b(a)(2)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C.

§§ 6b(a)(2)(A)-(C), by, among other things: (i) guaranteeing monthly profitable returns when

any such returns would come from Defendants' speculative and risky trading; (ii) promising the

safekeeping and return of the principal amount of customers' investments; (iii) falsely claiming

that Satterfield was an experienced and successful foreign currency trader; (iv) failing to

adequately disclose the risks of trading off-exchange leveraged foreign currency contracts; (v)

misappropriating customer funds; (vi) failing to disclose that a significant portion of customer

funds were misappropriated by Defendants and used for the payment of purported returns to

customers and commissions and fees to Defendants and their agents, as well as for Defendants'

personal use; and (vii) making oral and written false statements or reports to customers

concerning their investments, all in violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended

by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

82.     Defendants Satterfield and Bos engaged in the acts and practices described herein

knowingly or with reckless disregard for the truth.

83.     When they committed the foregoing acts, misrepresentations, omissions, and

failures, Satterfield, Bos and others acted as agents or within the scope of their employment,

office or agency with Graham Street and/or Shore-2-Summit.  Therefore, Graham Street and

Shore-2-Summit are liable for Satterfield's, Bos's and others' violations of the Act pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

84.     Satterfield controls Graham Street and Shore-2-Summit, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Graham Street's and Shore-2-Summit's conduct alleged in this Complaint.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Satterfield is liable for Graham Street's and Shore-2-Summit's violations of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

85.     Each act of fraudulent solicitation, misappropriation, misrepresentation or omission of material fact and false or misleading account statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

## VI.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers:

A.     Enter an order finding the Defendants violated Sections 4b(a)(2)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C);

B.     Enter an order of permanent injunction enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with

Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

      a.     Engaging in conduct in violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at7 U.S.C. §§ 6b(a)(2)(A)-(C);

      b.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006);

      c.     Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

      d.     Having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

      e.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

      f.     Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

      g.     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or

exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

h.     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010).

C.     Enter an order requiring the Defendants to make an accounting to the Court of all of Defendants' assets and liabilities, together with all funds they received from, and paid to, retail forex customers and other persons in connection with retail forex or purported retail forex transactions, including the names, addresses and telephone numbers of any such persons from whom they received such funds from June 18, 2008, to the date of such accounting, and all disbursements for any purpose whatsoever of funds received by retail forex customers, including salaries, commissions, fees, loans and other disbursements of money and property of any kind, from June 18, 2008, to and including the date of such accounting;

D.     Enter an order directing Defendants and any successors thereof to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices that constituted violations of the Act as described herein;

E.     Enter an order directing Defendants and Relief Defendant, as well as any successors to any defendant, to disgorge, pursuant to such procedure as the Court may order, all ill-gotten gains and/or benefits received from the acts or practices that constitute violations of the

Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

  F.  Enter an order requiring Defendants to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

  G.  Enter an order directing each Defendant to each pay a civil monetary penalty of not more than the higher of $140,000 for each violation of the Act committed on or after October 23, 2008, or $130,000 for each violation of the Act occurring before October 23, 2008 or triple the monetary gain to the Defendants, plus post-judgment interest;

  H.  Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

  I.  Enter any order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

        Respectfully submitted,

        WILLIAM N. NETTLES
        UNITED  STATES  ATTORNEY

        BY: s/ John H. Douglas

        JOHN H. DOUGLAS (#587)
        Assistant U.S. Attorney
        151 Meeting Street, 2d Floor
        Charleston, S.C.  29401
        (843) 727-4381 (voice)
        (843) 727-4443 (fax)
        Email: john.douglas@usdoj.gov

        Local Counsel for Plaintiff
        U.S. Commodity Futures Trading Commission

JENNIFER DIAMANTIS
Trial Attorney
CHRISTINE RYALL
Chief Trial Attorney
PAUL HAYECK
Associate Director
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, N.W.
Washington, D.C. 20581
Tel: (202) 418-5078 (Diamantis)
Tel: (202) 418-5318 (Ryall)
Tel: (202) 418-5312 (Hayeck)
Facsimile: (202) 418-5523
jdiamantis@cftc.gov
cryall@cftc.gov
phayeck@cftc.gov

Counsel for Plaintiff
U.S. Commodity Futures Trading Commission

Charleston, South Carolina

November 8, 2010